IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO. 5:14-CR-391-DAE(1) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ABRAM SCHMIDT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>ORDER DENYING MOTION TO SUPPRESS</u>

On September 23, 2014, the Court heard argument on Defendant Abram Schmidt's ("Defendant") Motion to Suppress evidence and statements obtained after a traffic stop in Kendall County, Texas.  (Dkt. # 23 at 3; dkt. # 39 at 2.)  Assistant United States Attorney Charlie Strauss, Esq., appeared at the hearing on behalf of the United States (the "Government"); Kurt G. May, Esq., appeared on behalf of Defendant.  After careful consideration of the arguments at the hearing and in the supporting and opposing memoranda, the Court **DENIES** the Motion to Suppress (Dkt. # 23).

1

## BACKGROUND

The evidence at issue arises from an incident on Saturday, April 26, 2014 at 8:14 a.m., when Texas Department of Safety Trooper Steven E. Mayfield ("Mayfield") stopped Defendant on I–10 Westbound in Kendall County, Texas. (Dkt. # 23 at 1; dkt. # 26 at 2.)

According to his September 23, 2014 hearing testimony, Mayfield has been employed for the past six and a half years with the Department of Public Safety's Texas Highway Patrol, where he is responsible for traffic and criminal enforcement and crash investigation. Prior to joining DPS, he received a Bachelor of Science degree in Criminal Justice from University of Texas at San Antonio. Mayfield received training at the Department of Public Safety's academy and has participated in annual in-service training since joining Texas Highway Patrol.

According to Mayfield's testimony, Mayfield was patrolling I–10 in Kendall County with Deputy Larry Drozd ("Drozd") on the morning of the incident. After observing Defendant speeding, Mayfield began his pursuit. According to Drozd's calculation, Defendant's car was traveling at 87 miles per hour in a 75 miles per hour zone. (Dkt. # 23 at 1; dkt. # 26 at 2.) As Mayfield pursued Defendant on the highway, he also observed the car driving in the left lane without passing and following too closely in violation of Texas law. (Id.)

After stopping Defendant's car, which had Ontario, Canada license plates, and advising Defendant of the traffic violations that he had committed, Mayfield asked Defendant for his driver's license and registration documents. (Dkt. # 26 at 3.)  In response to Mayfield's questions, Defendant stated that he was traveling from Mexico to Canada.  (Dkt. # 23 at 1–2; dkt. # 26 at 3.)

While speaking with Defendant, Mayfield noticed a handheld, butane torch, somewhere between eight and ten inches long, in the front passenger seat of Defendant's car.  (Dkt. # 26 at 3 n.3; see also dkt. # 23 at 2.)  Mayfield avers that, based on his training and experience, he recognized the torch as the type commonly possessed by methamphetamine users to heat up methamphetamine pipes.  (Dkt. # 26 at 3 n.3.)  Mayfield asked Defendant about the torch, and Defendant stated that he used it to light cigarettes. (Dkt. # 23 at 2; dkt. # 26 at 3.) According to Mayfield's testimony, Mayfield believed that a torch of that kind was inappropriate for the purpose and would have incinerated a cigarette if it was used as Defendant suggested.

Mayfield then returned to the topic of Defendant's travel plans.  (Dkt. # 23 at 2; dkt. # 26 at 4.)  In response to Mayfield's questions, Defendant told Mayfield that he left Mexico the day before, after having been there for two weeks. (Dkt. # 26 at 4.)  When asked "what was going on in Mexico?" Defendant stated that he lived there.  (Id.)  Defendant said that he was traveling to Canada for three

3

weeks, but would then be returning to Mexico.  (Id.)  Mayfield noticed that there were no bags or luggage visible in the vehicle, as would be expected for a three-week trip.[1]  (Id.)  Mayfield also noticed that the vehicle looked "lived-in"; he observed a partly empty coke bottle, an empty bag of chips, a Monster energy drink, a cup of IHOP coffee, and a blanket behind the console in the back seat.  (Id. at n.3.)  Mayfield avers that, based on his training and experience, he believed that the lived-in look could indicate signs of criminal activity like trafficking of narcotics or currency.  (Id.)  Mayfield also noticed that Defendant avoided eye contact, which he concluded indicated nervousness and evasiveness.  (Id. at 4 n.2.)

During this exchange, Defendant claimed that he had never been arrested; however, upon further questioning, Defendant admitted that "he had a problem at the border one time."  (Id. at 4.)  Defendant clarified he had been arrested at the border for failing to declare $14,000.  (Id. at 4–5.)  Mayfield then asked Defendant if he had any drugs, money, or large amounts of currency in the vehicle, and Defendant responded that he did not.  (Dkt. # 23 at 2; dkt. # 26 at 5.)

At this point, Mayfield asked Defendant to step out of the vehicle and to walk with him to the rear of the vehicle.  (Dkt. # 23 at 2; dkt. # 26 at 5.)  Mayfield also asked Defendant for his vehicle registration, which Defendant

---

[1] During the subsequent search of the vehicle, Mayfield did find a suitcase behind the driver's seat.  (Dkt. # 26 at 10.)  However, according to Mayfield's testimony, this suitcase was not visible from the exterior of the vehicle.

provided, and asked whether the car belonged to Defendant.  (Dkt. # 23 at 2; dkt. # 26 at 5.)  Defendant replied that it did.  (Dkt. # 26 at 5.)

After Defendant exited the car, Mayfield continued to question Defendant about his life in Mexico.  (Dkt. # 23 at 2; dkt. # 26 at 5.)  Defendant stated that he lived in Durango, Mexico, but that he had not been there in twenty years.  (Dkt. # 26 at 5.)  Defendant stated that he had been born there and returned to see if he liked it better in Mexico, which he did.  (Id.)  Mayfield then asked about Defendant's route to Canada, since traveling on I–10 Westbound was an indirect route.  (Id. at 6.)  Defendant said he took 57, then changed his answer to 75, paused to think, and then said he just follows the GPS.  (Id.)

At this point, Mayfield noticed that Defendant had a skin condition that Mayfield recognized as consistent with what he had observed and/or learned was an indicator of methamphetamine use.[2]  (Id.)

Mayfield again asked Defendant if he possessed anything illegal in the car, and Defendant repeated that he was not carrying any contraband.  (Id. at 6; dkt. # 23 at 2.)  Mayfield asked Defendant for consent to search the vehicle, but Defendant declined.  (Dkt. # 23 at 6; dkt. # 23 at 2.)  Mayfield then performed a weapons frisk on Defendant and found a knife.  (Dkt. # 23 at 2; dkt. # 26 at 6.)

---

[2] Although Defendant disputes the fact that he had open sores on his face (Dkt. # 23 at 2 n.2), the Court finds Mayfield's belief credible.

At this point, Mayfield contacted San Antonio Dispatch ("Dispatch") to find out whether a K–9 unit was available. (Dkt. # 26 at 7.) Dispatch informed him that there was not a K–9 unit currently on duty. (Id.) According to his testimony, Mayfield was unable to run a traditional license and registration check on the vehicle because the license and registration documents were Canadian, and those records were not linked with his system. Because of his inability to do so and because of Defendant's currency-related arrest, Mayfield asked Dispatch to run an EPIC check on Defendant and his vehicle.[3]

Upon learning that the San Antonio DPS K–9 unit was not on duty that day, Mayfield called fellow DPS Officer Kristina Klawin ("Klawin") at 8:22 a.m. Klawin was an on-call K–9 handler. When Klawin indicated that she was available to come to the scene, Mayfield advised her of his location and requested her presence. (Id.) As he waited for Klawin to arrive, he continued questioning Defendant about his trip. (Id. at 7–8.)

According to Mayfield's testimony, about 28 minutes into the traffic stop, or at about 8:42, Mayfield received the results of the EPIC check. The results indicated that Defendant was involved in a money laundering case in July 2013.

---

[3] According to Mayfield's testimony, an EPIC check provides officers with criminal history records possessed by the El Paso Intelligence Center. As a matter of process, field officers who need to run EPIC checks must make their requests through Dispatch. Dispatch calls the El Paso Intelligence Center with requests, and the El Paso Intelligence Center sends back results after investigation.

Klawin arrived at 9:02 a.m. and began a free air search around the exterior of the vehicle with the dog.[4]  (Id. at 9; dkt. # 23 at 2–3.)  The dog alerted, and officers searched the vehicle and found two bundles of cash totaling $1,780, various items associated with narcotics and currency smuggling, and a five gram bag of methamphetamine.  (Dkt. # 26 at 10; dkt. # 23 at 3.)  Mayfield read Defendant his Miranda rights and took Defendant into custody.  (Dkt. # 26 at 10.)  A more thorough search of the vehicle at the Kendall County Sheriff's Department revealed two kilograms of heroin in the vehicle.  (Id.)

On May 21, 2014, Defendant was indicted on one count of unlawfully possessing with intent to distribute a controlled substance, which involved a mixture or substance containing detectable traces of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (Dkt. # 1.)  On May 25, 2014, Defendant filed the instant Motion to Suppress (Dkt. # 23), and the Government filed its Response on August 5, 2014 (Dkt. # 26).

## DISCUSSION

In his Motion to Suppress, Defendant argues that he was unlawfully detained beyond the scope of the traffic stop in violation of the Fourth Amendment

---

[4] Defendant notes that there is a discrepancy in the time of arrival.  Mayfield's report indicates that the K–9 unit arrived at 9:02 a.m., while the K–9 officer's report indicates that she arrived at 9:00 a.m. and conducted the search at 9:05 a.m. (Dkt. # 23 at 3 n.3.)  This minor difference is not, in the Court's view, significant.

and that the items seized and his subsequent statements must therefore be suppressed.  (See Dkt. # 23 at 4.)

The Government counters that Mayfield developed reasonable suspicion to believe that Defendant was in possession of controlled substances and that, therefore, Defendant's detention was reasonable.  (See Dkt. # 26 at 17–19.)

I.    Fourth Amendment

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Traffic stops are considered seizures within the meaning of the Fourth Amendment." United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).  Courts analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Pack, 612 F.3d 341, 349–50 (5th Cir. 2010), modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010).

Pursuant to Terry, courts evaluate the legality of police investigatory stops in two parts.  First, courts examine whether "the officer's decision to stop the vehicle was justified at its inception."  Id.  Second, courts analyze "whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place."  Id.  The

"detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges."  United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004).  The Government has the burden of proving reasonable suspicion under Terry when officers act without a warrant.  United States v. Gomez, 623 F.3d 265, 269 (5th Cir. 2010).

II.   Terry Analysis

Defendant does not contest the validity of the stop under the first prong of Terry; instead, he argues under the second prong of Terry that the officer's actions were not reasonably related to the circumstances that caused the stop.  (See Dkt. # 23 at 4, 6.)  Specifically, Defendant contends that (1) Mayfield impermissibly extended the length of the detention by asking Defendant questions unrelated to the purpose and itinerary of his trip; (2) Mayfield improperly detained Defendant for forty minutes while waiting for the K–9 unit; and (3) Mayfield lacked reasonable suspicion to justify his actions.  (See id.)

For an officer's actions to be reasonably related in scope to the initial traffic stop, he may not detain a vehicle's occupants longer than the time necessary to investigate the circumstances that caused the stop.  United States v. Macias, 658 F.3d 509, 517 (5th Cir. 2011) (quoting Pack, 612 F.3d at 350).

9

Courts recognize that an officer remains within the scope of the initial stop when he requests a driver's license and registration documents and runs a check on those documents during the stop.  Brigham, 382 F.3d at 507–08.  Additionally, an officer can ask a driver questions about his itinerary and the purpose of his trip.  Id. at 508.  "Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made."  Id.

A Fourth Amendment violation does not necessarily arise when an officer asks questions unrelated to the purpose of the stop.  Macias, 658 F.3d at 517 (quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993)).  "This is because 'detention, not questioning, is the evil at which Terry's second prong is aimed.'"  Id. (quoting Shabazz, 993 F.2d at 436).  Rather, questioning only implicates the Fourth Amendment when it extends the duration of the stop.  Id. at 518 ("[W]e have held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop." (internal quotation marks omitted) (quoting Pack, 612 F.3d at 350)).  Therefore, questions asked while an officer is awaiting a license and registration check—even questions unrelated to the stop—are permissible under Terry's second prong.  See Shabazz, 993 F.2d at 436 (finding no Fourth Amendment violation when the questioning at issue occurred while the officers

10

were awaiting the results of the computer check).  However, if an officer's

unrelated questions extend the duration of the stop, the questions violate Terry

unless they are based on reasonable suspicion.  Id. (quoting Pack, 612 F.3d 350).

A.    Mayfield's Questions

Mayfield's initial actions and questions were squarely within the

scope of the circumstances that caused the stop.  Mayfield asked Defendant for his

license and registration, and then asked him detailed questions about his itinerary

and the purpose of his travel.  (Dkt. # 23 at 1–2; dkt. # 26 at 3.)  Because Mayfield

was justified in stopping Defendant for traffic violations, these questions were

permissible.  See Brigham, 382 F.3d at 507–08.

During the course of this questioning, Mayfield also asked Defendant

about the torch that he observed on Defendant's front passenger seat.  Because the

torch was in plain view, and because Mayfield recognized it as the type of torch

frequently possessed by methamphetamine users, Mayfield was justified in

questioning Defendant about the torch.  See United States v. Akinson, 248 F.3d

1149, at *1 (5th Cir. 2001) (finding that officers were permitted to ask questions

about potentially criminal items in plain view in the defendant's vehicle during a

traffic stop).

Additionally, Mayfield asked Defendant about his criminal history.

The Fifth Circuit has not definitively spoken about whether questioning about

criminal background during a traffic stop is related to the purpose or itinerary of the trip.  See Macias, 658 F.3d at 521 ("Assuming, arguendo, that such a question [about the defendant's criminal background] was not unrelated to the purpose or itinerary of the trip . . . .").  Because Defendant does not challenge this question as outside the permissible scope of inquiry, the Court follows our sister courts and assumes that brief questioning about criminal history is either a permissible part of the officer's initial questioning or a minimal intrusion that does not rise to level of a Fourth Amendment violation.  See, e.g., United States v. Platt, No. 12-0094, 2012 WL 4023814, at *1 (W.D. La. Aug. 6, 2012) (noting that during the officer's initial questioning, the defendant revealed drug-related criminal history, and using that fact in evaluating reasonable suspicion); United States v. McCoy, No. 2:09-cr-126, 2010 WL 1664025, at *2 (N.D. Miss. Apr. 21, 2010) (finding that the officer's "brief series of questions related to his prior criminal history" was minimal and not itself a Fourth Amendment violation).

After Mayfield asked Defendant to step out of the vehicle, Mayfield began to question him about his life, lifestyle, and employment in Mexico.  (Dkt. # 23 at 2; dkt. # 26 at 5.)  The Court finds that these questions were unrelated to the initial reason for the traffic stop.  The information that Mayfield sought from this questioning was irrelevant to the determination of whether a citation for speeding was proper.  See Macias, 658 F.3d at 518 (finding questions about where the

12

defendant was employed, what type of work he did, and whether he owned his business, and questions about the defendant's passenger's children, babysitter, and employment, as among questions unrelated to the purpose and itinerary of the trip).

   B.   Reasonable Suspicion

      Because the questions were unrelated to the original purpose of the stop, the inquiry turns on whether the questions were related to some other criminal activity for which Mayfield had developed reasonable suspicion.  If there were articulable facts that justified continued detention (and, therefore, additional questioning on topics unrelated to the purpose and itinerary of the trip), the resulting delay in running the computer checks is permissible.  See United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.").

      Defendant argues that Mayfield's observations of him were insufficient to create reasonable suspicion.  (Dkt. # 23 at 6.)  He contends that the torch and caffeinated beverages in the truck were not indicative of illegal activity, and that nervousness and small inconsistencies in statements are immaterial in evaluating reasonable suspicion.  (Id. at 7.)  Moreover, he argues that Mayfield

concluded that Defendant fit the profile of a drug trafficker without offering any

evidence specific to Defendant's circumstances.  (Id. at 6.)

        The Government counters that by the time that Mayfield asked the

questions at issue, he had developed reasonable suspicion because: (1) the torch

sitting on Defendant's front seat was of a kind commonly used by

methamphetamine users; (2) the vehicle had a messy, lived-in look, common to

vehicles involved in narcotics or currency trafficking; (3) Defendant carried no

visible luggage, despite his statement that he would be traveling for three weeks;

(4) Defendant avoided eye contact, indicating nervousness; (5) Defendant had

previously been arrested for failing to declare $14,000 that he was bringing across

the border; and (6) Defendant was traveling on a known drug-trafficking corridor.

(Dkt. # 26 at 14–15.)

        "Reasonable suspicion exists when the detaining officer can point to

specific and articulable facts that, when taken together with rational inferences

from those facts, reasonably warrant the . . . seizure."  Pack, 612 F.3d at 352

(internal quotation marks omitted) (quoting Estrada, 459 F.3d at 631).  In

evaluating those facts, the court "must look at the totality of the circumstances and

consider the collective knowledge and experience of the officers involved."

United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000).  "Although an officer's

reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal

activity need not rise to the level required for probable cause, and it falls

considerably short of satisfying a preponderance of the evidence standard." <u>Pack</u>,

612 F.3d at 352 (internal quotation marks omitted) (quoting <u>United States v.</u>

<u>Arvizu</u>, 534 U.S. 266, 274 (2002)).

   In evaluating whether reasonable suspicion exists, "[c]ourts must

allow law enforcement 'officers to draw on their own experience and specialized

training to make inferences from and deductions about the cumulative information

available to them that 'might well elude an untrained person.''" <u>United States v.</u>

<u>Estrada</u>, 459 F.3d 627, 633 (5th Cir. 2006) (citing <u>Arvizu</u>, 534 U.S. at 273).

   Although Defendant is correct that nervousness and inconsistencies

alone are insufficient to give rise to reasonable suspicion (Dkt. # 23 at 7–8), they

contribute to the Court's evaluation of the totality of the circumstances. <u>See</u>

<u>Estrada</u>, 459 F.3d at 632 (finding that inconsistent statements, in combination with

physical evidence indicative of drug trafficking, gave rise to reasonable suspicion);

<u>United States v. Gonzalez</u>, 328 F.3d 755, 758 (5th Cir. 2003) (finding that

nervousness, in combination with inconsistencies, prior drug arrest, and travel on a

known drug trafficking corridor, gave rise to reasonable suspicion); <u>United States</u>

<u>v. Wallstrum</u>, 515 F. App'x 343, 351 (5th Cir. 2013) (finding that containers of

energy drinks, water bottles, and snack containers, in combination with

nervousness, inconsistent statements, travel on a known drug corridor, and travel

with another vehicle, created reasonable suspicion).  Likewise, previous arrests can contribute to reasonable suspicion, even though a previous arrest alone would be insufficient to give rise to reasonable suspicion.  See Gonzalez, 328 F.3d at 758.

The Court considers all of these factors together with Mayfield's experience in evaluating the totality of the circumstances.  See Terry, 392 U.S. at 27.  Together, the potential drug paraphernalia,[5] the inconsistencies between Defendant's travel plans and his luggage, the "lived-in" look of his vehicle, the prior arrest, and the travel on a known drug corridor create a reasonable suspicion of criminal activity.  Like in Brigham, where "the officer's 'increasing suspicion was also fueled by [the defendant's] extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own," Mayfield's questioning was a "graduated response to emerging facts." Macias, 658 F.3d at 520 (emphasis and internal quotation marks omitted) (quoting Brigham, 382 F.3d at 508); see also United States v. Wolfe, 370 F. App'x 549, 549 (5th Cir. 2010) (finding reasonable suspicion where there was a torch lighter and butane canister in plain view and a glass beaker in the trunk, inconsistent

---

[5] While Defendant is right that a torch "is not per se a criminal tool simply because it is capable of being used in criminal activity," Mayfield was not bound to ignore it simply because Defendant stated that he used the torch to light cigarettes.  (See Dkt. # 23 at 7.)

16

statements about the trip, a one-way vehicle rental, travel from a city known for drug distribution, and the defendant's increasing nervousness).

The Court does not find Defendant's argument that Mayfield lacked reasonable suspicion because his conclusions rested entirely on consistency with a drug trafficker profile to be persuasive.  (See Dkt. # 23 at 6.)  Although relying on a profile alone is insufficient, officers can base reasonable suspicion on factors from a profile if there is additional evidence beyond that profile.  See United States v. Urrieta, 520 F.3d 569, 576 (6th Cir. 2008) (finding that reliance solely on the following drug-trafficking profile factors was impermissible: nervousness, travel on a drug trafficking corridor, and driving a car of greater value than the one the driver was towing).  Here, Mayfield relied on articulable facts beyond a mere profile—facts which were specific to the conditions that Mayfield observed regarding Defendant and his travel.

Therefore, the Court finds that under the totality of the circumstances, Mayfield had reasonable suspicion of some other criminal activity beyond Defendant's road behavior that initially led to the stop.  Because Mayfield had reasonable suspicion to prolong the stop, his questions that were unrelated to the initial traffic violations do not violate Terry or the Fourth Amendment.

C. Questioning Before Computer Check

To the extent that Defendant argues Mayfield's unrelated questioning is nevertheless unconstitutional because it occurred before Mayfield ran the computer check of his license, Defendant's argument fails. Engaging in questioning prior to running a computer check is not per se unreasonable under the Fourth Amendment.

An officer need not immediately obtain a driver's license and registration documents and run them through the system before questioning the driver. Brigham, 382 F.3d at 511. "There is . . . no constitutional stopwatch on traffic stops." Id. "Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in a particular sequence with, other efficient means. Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop." Id.

The Fifth Circuit has explicitly held that an eight-minute delay does not necessarily constitute an impermissible extension of a traffic stop. Estrada, 459 F.3d at 631. In Estrada, the defendants were stopped for a license plate lamp violation while traveling on I–10 from Mexico. Id. at 628–29. The officers questioned the defendants for eight minutes before running a computer check on their documents. Id. The court found that the eight minutes of questioning before

the computer check did not "implicate Fourth Amendment concerns," relying on

Brigham's holding that the order of questioning and computer checks is not fixed.

The facts of this case are analogous, and therefore Estrada forecloses

the argument that the eight minute delay per se violated Defendant's Fourth

Amendment rights.

Defendant relies on United States v. Dortch, 199 F.3d 193 (5th Cir.

1999), to argue that "[t]he Fifth Circuit has found that a delay of even 9 to 10

minutes into the stop before calling a canine unit was an unjust detention."  (Dkt.

# 23 at 5.)  This argument ignores the reasoning behind Dortch.  In Dortch, the

court did not find that the delay was unreasonable because it was nine to ten

minutes long.  Rather, the court found that the delay was unreasonable because

"the justification for the detention ceased once the computer check came back

negative, and the canine search was not performed until after that completed

check."  Dortch, 199 F.3d at 200.   This case is distinguishable.  Unlike in Dortch,

where the officer had no reasonable suspicion for any crime beyond the traffic

violation, Mayfield had reasonable suspicion that Defendant was involved in

trafficking.  The justification for the stop had changed—it had not ceased— and

therefore Dortch's holding is inapposite to this case.

D. Length of Detention While Awaiting K–9 Unit

19

Finally, Defendant contends that the forty minute delay between when Mayfield called the K–9 unit and when the K–9 unit ultimately arrived was an unjustifiable detention.  (Dkt. # 23 at 6.)  Defendant argues that the stop should have ended when the computer checks on Defendant's identification came back. (Id.)

The Court notes first that testimony at the hearing made clear that the delay between the results of the computer check and the arrival of the K–9 unit was 20 minutes, as opposed to the 40 minutes discussed in the parties' motions.[6]  See Pack, 612 F.3d at 361–62 (analyzing the length of delay before the arrival of the K–9 unit from the point at which the officer received results of the computer check, rather than the point at which the officer made the call for the unit).

Because the Court has already found that Mayfield had reasonable suspicion to prolong the stop, the delay while Mayfield "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly" was acceptable under the Fourth Amendment.  Brigham, 382 F.3d at 511 (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)); see also Pack, 612 F.3d at 350 ("If the officer develops reasonable suspicion of additional criminal

---

[6] According to the hearing testimony, the initial stop occurred at 8:14 a.m. Mayfield testified that he received the results of the EPIC check twenty-eight minutes into the stop, which would have been at 8:42 a.m.  Because the K–9 unit arrived at 9:02 a.m., the testimony establishes that the delay between the receipt of the EPIC check and the arrival of the K–9 unit was only twenty minutes.

activity during his investigation of the circumstances that originally caused the

stop, he may further detain its occupants for a reasonable time while appropriately

attempting to dispel this reasonable suspicion.").  "It is not the duration of time, but

the quantity of evidence, that determines whether reasonable suspicion survives the

officer's background check."  United States v. Jenson, 462 F.3d 399, 406 n.7 (5th

Cir. 2006).

        The Court finds that Mayfield acted diligently in the time preceding

and after his call for the K–9 unit.  Only eight minutes elapsed between the time

Mayfield stopped Defendant and when Mayfield called for the K–9 unit.  This is

well within time frames that the Fifth Circuit has found to be reasonable.  See, e.g.,

United States v. Schlieve, 159 F. App'x 538, 541 (5th Cir. 2005) (finding that a 25

minute delay between the initial stop and the decision to call the K–9 unit was

reasonable because the time was used to diligently investigate the officer's

reasonable suspicion).

        Mayfield spent the eight minutes between the initial stop and his

decision to call the K–9 unit questioning Defendant to ascertain whether Defendant

was in possession of controlled substances.  After Defendant's statements and

actions created a reasonable suspicion of criminal activity, Defendant declined to

allow Mayfield to search the vehicle.  Mayfield immediately performed a weapons

frisk and then called for a K–9 unit.  See Pack, 612 F.3d at 361–62 (finding that the

21

delay caused by the arrival of a K–9 unit was reasonable, since the officer tried to dispel his suspicion by seeking consent to search the vehicle and, when denied, immediately called a K–9 unit).

The delay was a result of circumstances outside of Mayfield's control. Mayfield stopped Defendant near Milepost 533 of I–10 in Kendall County, in a rural area approximately an hour outside of downtown San Antonio.  As the Eighth Circuit has held, "[t]he constitutional prohibition against unreasonable seizures does not require 'law enforcement officials, at considerable public expense, to maintain specialized personnel and equipment at remote locations at all hours of the day and night, or to forgo the timely investigation of serious offenses as to which they have reasonable, articulable suspicion . . . .'"  United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting United States v. Maltais, 403 F.3d 550, 558 (8th Cir. 2005)).

When Mayfield was informed there was not a K–9 unit available at that time, he reached out directly to an on-call K–9 officer and asked her to come to his location.  (Dkt. # 26 at 7.)  See Pack, 612 F.3d at 361 (finding significant that the officer cancelled a request for a K–9 unit when dispatch informed him that the unit would not arrive for 45 minutes, and calling in a request to another county). "When [Defendant] failed to consent to the search, Mayfield had three options: seek a warrant to search, request a drug dog, or allow [Defendant] to continue on in

22

his journey." (Dkt. # 26 at 18.)  Given Mayfield's reasonable suspicion, Mayfield was under no obligation to let Defendant depart.  Mayfield's decision to independently locate a drug dog, as opposed to begin the steps required to seek a warrant, was a diligent pursuit of a means of investigation to confirm or dispel his suspicions as quickly as possible.

Therefore, the twenty minute delay from the time the computer check ceased to the time the K–9 unit arrived was reasonable.  Moreover, even if the delay was forty minutes, that delay would have still been reasonable, considering the location of the stop and the fact that the only K–9 units available were on-call, rather than on-duty.  Although the Fifth Circuit has not addressed a delay of longer than 30 minutes between the call for a K–9 unit and its arrival, other circuits have found delays between forty minutes and an hour while waiting for a K–9 unit to be permissible.  Donnelly, 475 F.3d at 950–951, 954 (finding that a delay of fifty-nine minutes between the officer's request for a canine unit and its arrival was reasonable); United States v. Frost, 999 F.2d 737, 742 (3d Cir. 1993) (finding that a delay of one hour between the detectives' call for a drug-sniffing dog and the dog's arrival was reasonable at six o'clock in the evening when a K–9 unit was not on duty on location).  Because the Court has already determined that Mayfield had reasonable suspicion that Defendant was in possession of a controlled substance, the Court holds that he had reasonable suspicion to call the K–9 unit.

23

The Court finds that Mayfield had reasonable suspicion justifying the extension of the initial traffic stop and his subsequent call to the K–9 unit. Therefore, Defendants have not established a violation of the Fourth Amendment. Further, the Court finds that Mayfield's testimony regarding the facts surrounding this incident to be credible.

<u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES** Defendant's Motion to Suppress (Dkt # 23).

**IT IS SO ORDERED.**

**DATED:**  San Antonio, Texas, September 24, 2014.

David Allen Ezra
Senior United States Distict Judge

24